**HEALY, Exrx v CINCINNATI, NEW ORLEANS & TEXAS PACIFIC RY**

Ohio Appeals, 1st Dist, Hamilton Co

No 5560. Decided April 3, 1939

John A. Scanlon, Cincinnati, for appellee.

Harmon, Colston, Goldsmith & Hoadly, Cincinnati, and J. L. Kohl, Cincinnati, for appellant.

## OPINION

By ROSS, J.

Appeal on questions of law from the court of common pleas of Hamilton county.

The action was brought by the executrix of an employee of the defendant Railway company. As executrix, she seeks to recover compensation for the loss occasioned by the negligent killing of her husband by the defendant; such compensation being proportionate to the pecuniary loss of his legal dependents.

The suit is predicated upon the provisions of The Federal Employers' Liability Act (Title 45; ections 51-59, U. S. Code) and also the provisions of the Automatic Coupler Section of the Federal Safety Appliance Act (Title 45, section 2, U. S. Code).

In the petition it is alleged that the decedent, Healy, while engaged as an employee of the defendant and in the course of his employment as an "air inspector" of railroad cars, employed in interstate commerce by the defendant, and while repairing and adjusting the couplers (not air couplers) of two freight cars, was injured by the negligence of the defendant's employees in the following particulars:

(1) The defendant was operating freight cars not equipped with couplers which would couple by impact, in violation of the Automatic Coupler Section of the Federal Act, supra.

(2) In failing to place a blue flag at the south end of a "cut of cars", the decedent having employed himself in work upon a coupler of a freight car located on the same track some forty feet north of the north end of such cut of cars.

(3) The employees of the defendant backed such "cut of cars" northwardly, when the custom of the yards entitled the decedent to believe that the movement would be from the north instead of from the south. That is, that the north "cut of cars" would be backed southwardly into the south "cut of cars", rather than the south "cut of cars" backed or pushed northwardly into the north cut of cars. There were 49 cars in the south "cut of cars". The decedent was working on the 50th car, which was the south car in the north "cut of cars", consisting of 27 cars. Both south and north "cuts of cars" were located on track 17.

(4) The defendant's employees used a "road engine" instead of a "switch engine" in backing the south "cut of cars" northwardly on track 17.

(5) The defendant's employees failed to warn the decedent, by use of whistle, of the proposed movement of the south "cut" of 49 cars northwardly, and he was caught between the 49th car at the north end of the south "cut of cars" and the 50th car the south car of the north cut of 27 cars, and injured, so that he died in a few hours thereafter.

(6) The defendant failed to cause one of its employees to take a position upon the north end of the north (49th) car, when moving the south "cut of cars" northwardly.

(7) The defendant's employee, who caused the south "cut of cars" to be moved northwardly, failed to await a signal from the decedent Healy that he was ready to have the south "cut of cars" moved northwardly.

It is the contention of the plaintiff that the evidence produced at the trial, which extended over one week, sustains all of the assignments of negligence. It is the contention of the defendant that the evidence sustains no one of such assignments and develops that the decedent employee was guilty of negligence, which was the direct proximate and sole cause of the injuries which caused his death. The defense of contributory negligence was not pleaded by the defendant, but was put in issue by the evidence.

There are certain facts about which there is no dispute.

The yards of the defendant railway extend in a general north and south direction. The main line is on the extreme west. The switch tracks also run in a general northerly direction, extending north from a track on their southern extremity, in which they terminate, which terminal track runs in a general northwesterly direction into the main line. The switch tracks are numbered from west to east. Thus, No. 16 is west of No. 17.

On the day upon which Healy was injured, at about 1:25 P. M., the employees of the defendant were engaged in making up a freight train consisting of 95 freight cars a caboose and a road engine. Forty-nine of these cars were located on the south end of track No. 17, but extended to the south end of such track, so that they did not "clear" the track into which track No. 17 led.

Immediately north of this cut of 49 cars, on track No. 17, there was a space, about a car length—forty feet—and then a cut of 27 cars on the north portion of track No. 17. Another cut of 19 cars was to be moved on track No. 16,

northwardly and then backed southwardly into the north 'end of the cut of 27 cars.

It is the contention of the plaintiff that the decedent Healy had just reason to believe that the movement would then continue southwardly backing the two cuts thus joined into the cut of 49 cars on the south end of track No. 17—and that he was taken by surprise when the south cut was pushed northwardly by a road engine instead of a switch engine, no warning signal being given of this movement.

Three men, two besides Healy, were engaged as inspectors in making up the train. They all left a shanty near track 17 at about the same time. Each was assigned to a particular section of the train. Later comment upon the evidence will indicate what the evidence shows were their duties. The men separated and started to their several stations. Healy, when he reached the 50th car, the south car of the north cut, became interested in something about the main coupler—the device which holds the cars together. While he was engaged in this undertaking—later reference to the record will indicate what the evidence was as to this—a road engine was caused to move northwardly until it struck the south car of the south cut and then pushed the cut northwardly on track 17 over the interval of forty feet between car 49 and 50. Healy, apparently, was unaware of this movement behind him and was caught between these two cars and was mortally injured. No signal was given as a warning of this movement and Healy was not told that it was intended or contemplated. No flag was placed at the south end of the south "cut of cars" and no employee was placed upon the north end of the south "cut of cars" as it was pushed northwardly. Healy was not asked whether he was ready for the movement of the cars and gave no indication that he was ready.

The decedent was survived by his widow and five children. only one of whom was a minor at the date of the filing of the petition. As the trial was had just one year lacking two days af-

ter the filing of the petition, it may be presumed that at the time of trial all the decedent's children were adults.

The death of the decedent was directly due to the injuries received when crushed between the cars.

The Supreme Court of Ohio has definitely stated the rules governing an action brought under the provisions of the Federal Employers' Liability Act in **Bevan v N. Y. C. & St. L. Rd. Co., 132 Oh St 245.** As a guide to the application of the law to the evidence which we are now about to consider, it may be helpful here to quote from the syllabus of the Bevan case. The 1st, 2nd, 4th, 5th, and 6th paragraphs of the syllabus are:

"1. In an action properly brought under the Federal Employers' Liability Act (Title 45, Sections 51 to 59, U. S. Code) by an employee against his employer the rights and obligations of the parties depend upon that act and applicable principles of common law as interpreted by the federal courts.

"2. Such act permits recovery from an employer on the basis of negligence only, and the kind and amount of evidence required to establish it should be determined and measured by the standards approved and adopted by the federal courts.

"4. Where at the close of the employee's case in chief all of the evidence produced amounts at the most to a surmise or suspicion of negligence on the part of the employer. the latter is entitled to a directed verdict upon motion therefor.

"5. The employer is not an insurer of the employee's safety, but is under the continuing duty to exercise ordinary care to furnish the latter a reasonably safe place to work under the circumstances.

"6. Where upon all the evidence reasonable minds can come to but one conclusion, it is the duty of the court, if requested, to direct a verdict accordingly."

Motion for an instructed verdict was seasonably interposed in the instant

case. It is assigned as error that such motion was overruled. This assignment we consider with the claim that the verdict is against the weight of the evidence, and contrary to the evidence, and that the decedent was guilty of contributory negligence.

If any of the alleged specifications of negligence, hereinbefore noted, are found to be sustained by substantial evidence, and such negligence was proved to be the proximate cause of the decedent's injuries and death, or if his injuries and death were proximately caused by a defective coupler, the verdict of the jury is sustained.

Section 53 of Title 45, U. S. Code provides:

"In all actions hereafter brought against any such common carrier by railroad under or by virtue of any of the provisions of this chapter to recover damages for personal injuries to an employee, or where such injuries have resulted in his death, the fact that the employee may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee: Provided, That no such employee who may be injured or killed shall be held to have been guilty of contributory negligence in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee."

One of the chief claims of the defendant is that the decedent in many respects violated the "Rules of the Operating Department" of the defendant's system, which rules are in evidence. The plaintiff also relies upon these rules in many respects as sustaining her claim for relief. It will, therefore, be necessary, and undoubtedly tend to clarify the situation, to refer to these rules now in order that it may appear whether the parties were justified in their conduct.

Rule 55 in the Supplement provides that no employee is required to work under a car without protection signals. The workmen doing the work are required to protect themselves by putting a blue flag at the ends of the car or cars. No one is permitted to interfere with the flag or remove it except the workmen required to place it.

Rule 158, again provides that the workman seeking protection shall place the blue flag and be the only person permitted to remove it. Rule 26 in the Main Book is to the same effect.

The rules further provide that all employees are governed by the rules found in the rule books

Rule 31 provides a whistle must be sounded at all places where required by rule or law. There is no rule or law requiring a whistle to be sounded in the railroad yards when cars are being switched upon switch tracks.

Rule 103, provides that when cars are being pushed by an engine **"except when shifting or making up trains** in yards a trainman must take a conspicuous position on the front of the leading car." (Emphasis ours).

Rice, a witness for plaintiff, testified that while the two cuts of cars remained upon track 17. a cut of cars was pulled north on track 16, such cut to be dropped in at the north end of the cuts on track 17, that he, Rice, as switchman, rode the front end of the cut moving north on track 16 until he reached a point opposite the gap in the cuts on track 17, when he, for the purpose of performing his duty to couple the cars in the gap, dropped off upon the far or west side of his cut of cars, and that as a flat car passed in front of him, he saw Healy doing something about the coupler knuckle on the 50th car on track 17, as the remaining box cars passed him he was unable to warn Healy that the south cut on track 17 was moving slowly north. When the last car of his cut had passed him on track 16, he saw Healy crushed between the cars on track 17. Healy had his left hand upon the cut-off lever and his right hand on the grab iron on the end sill on the east side of the car. He took Healy to a shed. He made no statement to him except to tell him to

go on back and finish the work making up the train.

This witness further stated he did not know what Healy was doing. He stated that he later made the coupling between the two cars which made the gap in which Healy was injured, and that the coupling knuckle was closed, so that it would not couple automatically and it was necessary for him to step over the rail to adjust the coupling. He further stated it was the duty of the repairman to protect himself with a blue flag. Healy was working with two other men, Farrell and Waite, as repairmen. When a blue flag was needed for protection, the repairman would signal to the men at either end of the cut to place flags. The crew of switchmen in which Rice worked consisted of himself and McDine, a "head man", and Fricke, the foreman of the crew.

A road engine was used to push the south cut of cars northwardly and Rice stated that such an engine was frequently used for such purpose. From five to twelve switch engines were used in the yards, and it was very seldom that these engines blew whistles.

It is obvious from this evidence that the several cuts were to be pushed together, and when the full train of ninety-five cars was made up that, as was later done in this case, a blue flag was placed at either end and the repairmen proceeded to make any necessary connections or repairs required while protected by flags. Healy's work upon the south end of the 50th car was therefore premature and unlooked for by the other fellow employees engaged in working upon the train. His action was unwarranted unless he had taken the precaution to see that he was protected by a blue flag. There was no reason or rule forbidding the movement of the cuts at the time Healy was hurt.

Witness Rice stated at page 55 of the bill of exceptions:

"A. They whistle after the blue flag is taken down and he is given a signal from the air man that we are through with the track—they are through with the train, then he whistles."

Another witness stated, pages 112-113:

"Q. Now who did the coupling?
A. The engine on he rear end.
Q. The engine didn't do it. It was the crew that was with the engine?
A. The crew with the switch engine.
Q. That was Mr. Rice and his crew?
A. I don't know who it was, switch engine crew.
A. It was their business to get the train all hooked together?
A. From the rear end.
Q. Well, whichever end. Now what was the next thing to do?
A. Gets the car knocker.
Q. You will have to tell these ladies and gentlemen what the 'car knocker' is.
A. Might call them car inspectors.
Q. Mr. Healy was a knocker?
A. Whatever you call him, car inspector, car knocker.
Q. Was Mr. Healy a car knocker—do you know?
A. I don't know.
Q. Don't you know it? Do you know any of those car knockers?
A. Yes, the man that got killed, yes, the car inspector.
Q. Or car inspector?
A. Yes.
Q. You railroad men call him 'car knocker'?
A. That is a shorter method.
Q. Like they call engineers a 'hog man'?
A. 'Hog head'.
Q. You are a hog head, he is a car knocker. You have some very funny names in railroad business?
A. Lots of funny things. That isn't what they called him.
Q. Now after you were coupled to your train and the train was all coupled together, then you said the car knockers took the train, took charge of it?
A. They put the blue flag and take charge of it and we cut the air in and when everything is ready they give the signal to put the air on, and when they have looked it over give you the signal to release. When they get ready

they come over and take the blue flag up, and you are clear to go.

Q. When the blue flag is on you know men are apt to be in and around that train?

A. That engine was standing still.

Q. Why is it on there?

A. Protection of the men working on the train.

Q. Who got under it?

A. Under, on top or anywhere else.

Q. Now how do you know when those men, who are supposed to get under the train or on top of it, as you say, are through, in the clear, how do you know that?

A. When they are what?

Q. How do you know they are off of the train when they get under, under the blue flag, how do you know when they are through?

A. When they come there and take the blue flag off the engine.

Q. The car knocker takes it off?

A. Yes, the car inspector.

Q. When the blue flag is gone that indicates what, to you?

A. He tells me all right."

Noonan, a witness for the plaintiff stated, record page 216:

"Q. And they don't couple them up right away always, do they?

A. Well, no.

Q. They may and they may not. If it is handy they push them all down and couple them?

A. Sometimes they don't.

Q. Sometimes they miss coupling because both knuckles are closed and they can't couple?

A. That is right.

Q. Then what happens?

A. They have to pull them apart, reset them and couple them up.

Q. Reset the knuckles, don't they?

A. Yes.

Q. How do they do that?

A. Lift them apart, open them out and reset them.

Q. What is called the release lever, —lock pin lever,—pull that on the side, jerk it up, that releases it and if not then they try again?

A. Yes.

Q. Now, Mr. Healy had no business doing anything of that kind?

A. No.

Q. That is none of his work at all?

A. The switchman.

Q. The switchman and yard crew are charged with the job of coupling up the cars, aren't they?

A. Yes."

Farrell, another witness for the plaintiff, stated the same thing, record, page 134:

"Q. Now it is no part of your job to couple any cars, is it?

A. No, that is not our job, only the coupling of the hose.

Q. Yes. What I meant by that, is it your business to see the cars hooked together with these couplers? You haven't anything to do with that?

A. No, sir.

Q. That is the switchman's job who handles the car?

A. Yes, sir."

No work would be started until the train was made up and a blue flag posted. This same witness stated, record, page 141:

"A. So I could start when the engine came, and the flag was up, I could start to work."

And, on pages 148 and 149 of the record, Farrell stated:

"Q. Before the cars were coupled in on track 16, that is from the north, before they came in, you started to couple hoses, didn't you?

A. No. No."

"Q. Just one question None of you men were supposed to get in or under any of these cars of this train until you knew a blue flag was out?

A. No, sir, that was always our orders."

On page 220 of the record, witness Noonan states:

"Q. So as they went down the train, they were expecting a road engine to couple up and to couple in the air line, to turn on the air when it was ready?

A. Yes."

Phelps, the lead brakeman with the road engine, stated it was not customary to have a man on the rear of a cut of cars when moving in the yards.

Reviewing the evidence as applied to the several charges of negligence, there is nothing in the record to substantiate the claim that there was a defective coupler or that Healy's duties required him to repair the same, if there had been, or that his injuries and death were caused by any defective coupling device. All reference, therefore, to the Safety Appliance Act was irrelevant, and the court should not have charged thereon.

The first charge of negligence, therefore, was not substantiated by any evidence.

It appears also that if Healy for any reason decided to work upon the cars in such a manner as to expose himself to injury, it was his duty to see before doing so, that the cut of cars was protected by a blue flag. He made no effort in this direction and no one knew that he intended to work under or between the cars. This disposes of the second charge of negligence.

There is nothing in the record to indicate that the operation of the road engine in pushing the cars on track 17 northwardly, so that the car extending into the lead track, or track which cut all of the switch tracks toward the southwest, should be pushed clear of the lead track, was not a movement which could be made in the absence of a blue flag. None of the employees had any reason to believe that the train which was in the process of making could not be made up from either direction. The evidence shows that the car on track 17 extended over into the lead or track connecting the several switch tracks; that the road engine could not get by this obstruction. The yardmaster directed the engineer to push the car back into track 17. If Healy, intending to work on the 50th car had notified one of his fellow employees at the south end of the cut of cars, by signal, to place a blue flag at the south end of the cars, he would have been fully protected. This, not having been done, the yardmaster was fully justified in moving the cars north on track 17. The third and fourth charges of negligence, therefore, fail.

It appears also, conclusively, that whistle signals are not required by the rules to be given in switching operations, and the evidence indicates clearly that the employees were not accustomed to their use, and that if they were used, no one would gain any advantage by reason of the many movements constantly going on while various trains were being made up. This disposes of the fifth charge of negligence.

No rule or custom required a man to be stationed at the end of a cut of cars while a switching operation was in progress, during the making up of a train. There is no foundation, therefore, for the sixth charge of negligence.

Healy having neither given nor caused to be given any signal that he was exposing his person to danger, no one was required to await any signal that he was out of danger, and the seventh charge of negligence is unsubstantiated by the evidence.

It is the contention of the plaintiff that even if error occurred as to one of the specifications of negligence, that under the two issue rule, the error is harmless. This position is not sustained by the authorities. **133 Oh St 297**, holds that the several specifications of negligence are included in but one issue and that of negligence.

While it is the conclusion of the writer of this opinion that there is shown no evidence of negligence on the part of the defendant, my associ-

ates follow me only to the extent of agreeing to a reversal of the judgment of the trial court. As there is full concurrence, in this, the judgment will be reversed on the weight of the evidence, and the case remanded for a new trial.

By HAMILTON, PJ.

I concur in the judgment of reversal of the court of common pleas.

I am of opinion that the judgment should be reversed for error in the charge of the trial court in the general charge, wherein the court submitted the question of the violation of the Federal Statutes relating to defective equipment and defective coupler. I find no evidence of any defective equipment and no evidence of any defective coupler, directly contributing to decedent's injury and death.

See: B. & O. Ry. Co. v Tittle, 4 Fed. (2d.) 818, on the question of proximate cause.

The case should be remanded for a new trial, as there was evidence upon which reasonable minds might well differ on the question of the negligence of the defendant. The unusual act of backing the road engine off the main line into the siding and having it kick the cut of cars up the switch in order to clear the main line, all without warning of any kind, and without a man on the cut of cars kicked, and without warning the yard men engaged in preparing and making up the train in the yard by the yardmaster, who knew the decedent and others were working along the cars, and who gave the signal to the engineer, who had just arrived with his road engine, to back into the switch and kick the cut of cars back, is clearly sufficient evidence of negligence to take the case to the jury.

In support of my conclusion, I cite the following cases with comments:—

In Louisville & N. R. Co. v Lankford, 209 Fed., 321, at 323, the Court say:

"The motion to direct verdict was properly denied. There was testimony tending to show negligence on defend-

ant's part in using a road engine for switching purposes."

In the case of Halt v C. C. C. & St. L. Rd., 279 S. W., 148, the first paragraph of the syllabus is:

"1. In action under Federal Employers' Liability Act (U. S. Comp. St., Sec. 8657-8665), where a yard switchman was killed by the 'kicking' of a caboose by a road engine. refusal of the defendant's demurrer to evidence was proper, where there was evidence that use of road engine, instead of yard engine, in moving caboose, was contrary to yard custom."

On page 150, the Court says:

"The evidence further shows that Halt was not informed of the intended unusual movement on the part of the road crew of this caboose, and had no knowledge or warning prior to the movement thereof, that the caboose was to be moved by the road crew while deceased was engaged in making up the freight train. There was evidence on the part of the road crew that they were ordered to kick this caboose down this track No. 2 by a man named Joseph Lowery, who was on this particular occasion acting as temporary yardmaster; that this order to kick the caboose down was given them inside the yard office by the yardmaster. * * * There was evidence that Halt would not expect the caboose kicked over him from the rear."

The facts in the Halt case are very pertinent to the case under consideration.

In Hines v Logan, 269 Fed., 105, 107, it is stated:

"There was evidence to show that a custom existed to give warning, either by ringing the bell or blowing the whistle, of the approach of the train of cars to the point on the track where Logan was killed. Several witnesses testified that they heard no warning, and no witness testified that any was given

\* \* \*. All the witnesses agreed that another custom in vogue at this particular place was that a lookout should be on the car nearest this space or opening for the purpose of warning employees in case of danger."

In Frazier v Interstate Railroad Co., 264 Fed., 96, it is stated in the syllabus:

"\* \* \* The question of the duty to have a lookout on some car, or to give decedent warning, held not one to be determined as a matter of law, but for the jury."

The facts in the case of Harris v C. & E. I. Ry. Co., 158 N. E. 636, are very similar to the facts in the case under consideration. In the syllabus it is stated:

"The railroad company under Federal Employers' Liability Act is under the humane duty to anticipate the presence of employees under or between the cars, and to take such precaution for their safety as a proper lookout and timely warning of the approaching cars will afford, and this duty is owing whether the injured employee protects himself by means of a blue flag or not."

And the 7th paragraph of the syllabus is:

"In suit for damages under Federal Employers' Liability Act for death of railroad employee killed while coupling air hoses, when cut of cars was thrown against cars between which defendant was working, question whether switching crew were negligent in suddenly creating perilous situation by throwing cars against cars which decedent was coupling, without warning to him, held for jury."

In Southern Railway v Wilkens, 178 N. E., 454, it is stated, after discussing the blue flag rule:

"This rule appears to be to prohibit the running of cars upon a track where a blue flag is placed, but it does not exempt the railroad company from exercising due care where there is no blue flag, and it is a question for the jury to determine that fact. And the evidence adduced above is sufficient to show negligence even though the deceased did not put out a blue flag."

In Evans v Railroad Co., 147 Ark., 28, the court said on page 35:

"Three blasts of the whistle would have given him that information unmistakably. The engineer testified that railroad employees understood that signal like they did the English language, and we cannot say from the testimony that Evans did not have the right to expect that this signal would be given.

"If the exercise of ordinary care required that this signal be given, then the failure to give it was negligence; \* \* \* "

In the third paragraph of the syllabus, it is stated:

"In such action it was held a question for the jury whether the failure to give a back-up signal was negligence, although the railroad company had no rule requiring such a signal."

And in the fifth paragraph of the syllabus:

" \* \* \* the absence of such rule or custom is not conclusive on such subject."

In Seaboard Air Line Ry. v Koennecke, 239 U. S. 352, at page 355, Mr. Justice Holmes says:

"We see equally little ground for the contention that there was no evidence of negligence. It at least might have been found that Koennecke was killed by a train that had just come in and was backing into the yard, that the movement was not a yard movement, that it was on the main track and that there was no lookout on the end of the train and no warning of its approach. In short the jury might have found that the case was not that of **an injury done**

by a switching engine known to be engaged upon its ordinary business in a yard, like Aerkftz v Humphreys, 145 U. S., 418, but one where the rules of the company and reasonable care required a lookout to be kept. It seems to us that it would have been impossible to take the case. from the jury on the ground either that there was no negligence or that the deceased assumed the risk." (Emphasis ours).

In the Rule Book of the Railroad, Rule 30 provides:

"The engine bell must be rung when an engine is about to move."

The evidence is that the road engine, which had been telephoned for by the yardmaster, and which was located at Ludlow, Kentucky, came across the bridge and arrived on the main line at the yard switching ladder, and, on signal from the yardmaster, moved into the switch and kicked the car without giving any signal by ringing a bell or otherwise.

The case should be submitted to the jury on the common law negligence of the defendant, and any damages assessed, diminished by the contributory negligence of the plaintiff, if any, under §53, Title 45, of the Federal Statutes.

MATTHEWS, J, concurs.